UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

CARMEN A. VIVES,

                    Plaintiff,

          v.

NEW YORK CITY DEPARTMENT OF
CORRECTIONS, THE CITY OF NEW YORK,
GREGORY MCLAUGHLIN, JOSEPH PONTE,
and SANDRA LOWE,

                    Defendants.

-----------------------------------------------------------------

**MEMORANDUM & ORDER**
15-CV-06127 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiff Carmen A. Vives commenced the above-captioned action on October 26, 2015

against Defendants the New York City Department of Corrections (the "DOC"), the City of New

York, Gregory McLaughlin, Joseph Ponte, and Sandra Lowe. (Compl., Docket Entry No. 1.)

Plaintiff filed an Amended Complaint on July 6, 2016, alleging claims for failure to

accommodate and discrimination in violation of the Americans with Disabilities Act of 1990, 42

U.S.C. § 12101 *et seq.* ("ADA"), retaliation under the Family Medical Leave Act, 29 U.S.C.

§ 2601 *et seq.* ("FMLA"),[1] and gender and racial/ethnic discrimination under Title VII of the

---

[1] Although the Amended Complaint references interference and retaliation claims under the FMLA, (Am. Compl. ¶¶ 60–68), in her opposition to Defendants' motion for summary judgment, Plaintiff clarifies that her FMLA claim is based on her termination "for taking leave protected by the FMLA," and further clarifies that she "is not alleging that she was denied leave to which she was entitled under the FMLA," (Pl. Opp'n to Defs. Mot. ("Pl. Opp'n") 31, Docket Entry No. 38). Because FMLA retaliation claims "involve an employee actually exercising her rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by the employer," *Woods v. START Treatment & Recovery*

Civil Rights Act, 42 U.S.C. § 2000 *et seq.* ("Title VII"). (Am. Compl., Docket Entry No. 14.) Currently before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[2] (Defs. Mot. for Summ. J. ("Defs. Mot."), Docket Entry No. 35; Mem. in Supp. of Defs. Mot. ("Defs. Mem."), Docket Entry No. 35-32.) For the reasons set forth below, the Court denies Defendants' motion as to Plaintiff's ADA and Title VII discrimination claims, and grants Defendants' motion as to Plaintiff's FMLA claim.

## I. Background

### a. Plaintiff's employment at the DOC and her injury

Plaintiff identifies as a 54-year-old Hispanic female. (Am. Compl. ¶ 7.) Plaintiff was employed by the DOC as a corrections officer from July 2, 1987 until her termination on September 9, 2014. (Defs. L. R. 56.1 Stmt. of Undisputed Material Facts ("Defs. 56.1") ¶ 2, Docket Entry No. 35-31; Pl. L. R. 56.1 Stmt. of Undisputed Material Facts ("Pl. 56.1") ¶ 2, Docket Entry No. 37.) From 2000 to the date of Plaintiff's injury, Plaintiff worked in the laundry on Rikers Island as part of the DOC's Support Services Division. (Defs. 56.1 ¶ 3; Pl. 56.1 ¶¶ 3, 136, 137; Defs. Response to Pl. 56.1 ("Defs. Reply 56.1") ¶ 136, Docket No. 40.) "In the laundry, inmates launder uniforms, linen and bedding" for use by the DOC and other city

---

*Ctrs., Inc.*, 864 F.3d 158, 166 (2d Cir. 2017), the Court construes Plaintiff's allegations to be asserting an FMLA claim for retaliation.

[2] In her opposition to Defendants' motion, Plaintiff withdraws her claims against the DOC and explains that the only claims that she brings against Defendants McLaughlin, Ponte, and Lowe (the "Individual Defendants") are brought under the FMLA, and not under the ADA or Title VII. (Pl. Opp'n 13 n.1.) Plaintiff also withdraws her claim for failure to accommodate under the ADA. (*Id.* at 16.) Accordingly, the Court denies as moot Defendants' motion for summary judgment as to: (1) the DOC because it is not a proper Defendant; (2) the ADA and Title VII claims as to the Individual Defendants because they cannot be sued under the ADA or Title VII; and (3) the failure to accommodate claim under the ADA. (Mem. in Supp. of Defs. Mot. for Summ. J. ("Defs. Mem.") 4, 16–17, Docket Entry No. 35-32.)

agencies, and Plaintiff and other corrections officers were "responsible to oversee the inmates doing the work." (Aff. of Carmen A. Vives ("Vives Aff.") ¶¶ 3, 4, annexed to Decl. of Mark D. Risk ("Risk Decl.") as Ex. 1, Docket Entry No. 36-1.) This supervision "could be done from a glass walled office referred to as 'the bubble' from which [the officers] could see the inmates, by sitting at a desk outside the bubble, or by walking the floor." (*Id.* ¶ 4.)

On May 25, 2012, Plaintiff fell on uneven pavement on a sidewalk near her home and injured her right wrist and thumb. (*Id.* ¶ 8; Pl. 56.1 ¶ 153; Def. Reply 56.1 ¶ 153.) Plaintiff's medical records indicate that she sustained a "[r]ight thumb ulnar collateral ligament tear, internal derangement of metacarpophalangeal joint, and scarring of the radial sensory nerve," and underwent surgery to repair those injuries on June 6, 2012. (Forest Hills Hospital Operative Report 1736, annexed to Decl. of Eric Murrell in Supp. of Defs. Mot. ("Murrell Decl.") as Ex. M, Docket Entry No. 35-15; *see also* Pl. 56.1 ¶ 153; Defs. Reply 56.1 ¶ 153.)

Pursuant to DOC policy, Plaintiff reported to the DOC's Health Management Division ("HMD") shortly after her injury. (Defs. 56.1 ¶¶ 56, 69; Pl. 56.1 ¶¶ 56, 154.) HMD consists of physicians, physician's assistants, registered nurses, and uniformed corrections officers who are responsible for, *inter alia*, determining whether and when an employee who has reported sick may return to duty. (Defs. 56.1 ¶¶ 54–56; Pl. 56.1 ¶¶ 54–56.) HMD may recommend that an employee return to full duty, remain absent on sick leave, or return to work with one of three Medically Monitored Return ("MMR") designations. (Defs. 56.1 ¶ 61; Pl. 56.1 ¶ 61.) The three MMR designations are: (1) "no physical limitations — only overtime or tour restrictions"; (2) "some physical limitations — able to work a normal tour (in duration) where the job allows ample opportunity for sitting with some standing, walking, or climbing stairs (employee cannot be expected to do strenuous physical activity)"; and (3) "serious physical/psychological

limitations — abilities are more limited and must be specifically described." (Defs. 56.1 ¶ 62; Pl. 56.1 ¶ 62.) The parties agree that "if [P]laintiff had been given MMR status by HMD, there would have been a job for her to do somewhere within DOC." (Defs. Reply 56.1 ¶ 150; Pl. 56.1 ¶ 150.)

DOC assigned HMD physician Sandra Lowe, M.D. to Plaintiff's case. (Defs. 56.1 ¶ 66; Pl. 56.1 ¶ 66.) Plaintiff states that she met with Dr. Lowe approximately every three weeks after her injury, "constantly asking to be returned to work." (Vives Aff. ¶ 9.) At her first visit with Dr. Lowe or shortly thereafter, Plaintiff told Dr. Lowe that she wanted to return to duty. (Defs. 56.1 ¶ 69; Pl. 56.1 ¶ 69.) Plaintiff states that she met with Dr. Lowe twice on May 29, 2012, four days after her injury, and showed Dr. Lowe "[a] note from [a] doctor at Methodist Hospital that stated that [Plaintiff] could be returned to work." (Vives Aff. ¶ 8.) Plaintiff also told Dr. Lowe on May 28, 2012 that she was "able to return to work either in the laundry or in a light-duty position under the DOC's [MMR] program." (*Id.*)

At each of Plaintiff's subsequent appointments with Dr. Lowe, Plaintiff provided Dr. Lowe with a Treating Physician Summary Report ("TPSR"), the medical documentation form used by HMD to evaluate whether a corrections officer should return to duty and, if so, in what capacity. (Defs. 56.1 ¶¶ 65, 67; Pl. 56.1 ¶¶ 65, 67.) Plaintiff's private physician, Dr. Salil Gupta, completed and signed Plaintiff's TPSRs, (Defs. 56.1 ¶ 67; Pl. 56.1 ¶ 67), and often indicated that Plaintiff had certain limitations, *e.g.*, that she should not lift, carry, pull, or push anything with her right hand or arm, (TPSRs 1748, annexed to Murrell Decl. as Ex. P, Docket Entry No. 35-18), that her prognosis was "guarded," (*id.* at 1734), or that her "treatment" was "aggressive therapy" and "pain management," (*id.* at 1732).

Dr. Lowe testified at her deposition that even though Plaintiff indicated that she wanted to return to work, Dr. Lowe did not allow Plaintiff to return in any capacity because the TPSRs completed by Dr. Gupta indicated that Plaintiff's prognosis was "guarded" and did not "specifically say [that Plaintiff] should return to work" or to "limited duty." (Dep. of Sandra Lowe ("Lowe Dep.") 110:8–12, 116:8–117:4, annexed to Murrell Decl. as Ex. B, Docket Entry No. 35-4; *see also* Defs. 56.1 ¶ 76.) In addition, Dr. Lowe testified that she did not clear Plaintiff to return to work on MMR status because MMR is a "temporary assignment" reserved for employees whose conditions are "expected to just last a few months," and Plaintiff's limitations were "unknown or not determined" and she "did not know" where Plaintiff's "medical problem was headed." (Lowe Dep. 123:3–7, 147:5–148:3.) Dr. Lowe also testified that HMD doctors explain to employees "what their doctor needs to fill out on the form in order for them to return to work," and "does not give those instructions directly to the doctor." (*Id.* at 148:24–149:8.)

Plaintiff states that on January 15, 2013, she met with Dr. Gupta, expressed "frustration at not being able to return to work," and suggested that he specifically indicate on a TPSR that Plaintiff could be returned to "light duty." (Vives Aff. ¶ 15; *see also* Dep. of Carmen A. Vives ("Vives Dep.") 85:22–86:16, annexed to Murrell Decl. as Ex. A, Docket Entry No. 35-2.) Dr. Gupta complied with Plaintiff's request, completing a TPSR on January 15, 2013 indicating that Plaintiff could be returned to "light duty." (Defs. 56.1 ¶ 72; Pl. 56.1 ¶ 72.) Dr. Gupta also indicated that Plaintiff's prognosis remained "guarded." (Defs. 56.1 ¶ 72; Pl. 56.1 ¶ 72.) Dr. Lowe's contemporaneous notes indicate that Plaintiff presented the January 15, 2013 TPSR to Dr. Lowe February 13, 2013. (Lowe Dep. 178:20–179:8.) Despite the fact that the January 15, 2013 TPSR indicated that Plaintiff could return to "light duty," Dr. Lowe did not permit Plaintiff

to return to work because "the prognosis [remained] guarded."  (Pl 56.1 ¶¶ 183–85; Defs. Reply 56.1 ¶¶ 183–85; Lowe Dep. 179:20–25, 182:6–9.)

On February 26, 2013, Dr. Gupta authored a TPSR indicating that Plaintiff's prognosis was "good" and that she should "return to work for duty" on March 1, 2013, with "no restrictions."  (TPSRs 1724; Pl. 56.1 ¶ 189; Defs. Reply 56.1 ¶ 189.)  Upon review of the February 26, 2013 TPSR on February 28, 2013, Dr. Lowe did not permit Plaintiff to return to duty.  (Pl. 56.1 ¶ 190; Lowe Dep. 191:16–192:5.)  Dr. Lowe testified that she did not return Plaintiff to full duty because Plaintiff did not "permit[] a physical assessment," and did not return Plaintiff to duty on MMR status because Dr. Lowe "wasn't entertaining MMR" at that time. (Lowe Dep. 192:3–13.)  Plaintiff disputes that Dr. Lowe requested a physical assessment.  (Pl. 56.1 ¶¶ 192–94.)  Plaintiff testified that Dr. Lowe "at no time asked [Plaintiff] to examine [her]" and that she "never would have refused" if Dr. Lowe had asked Plaintiff to do so.  (Vives Dep. 227:2 –15; *see also* Vives Aff. ¶ 18 ("None of the HMD doctors ever asked to examine my hand. I would have gladly permitted them to do so.").)  Plaintiff contends that the two sets of notes in her medical file from the February 28, 2013 meeting, one written by Dr. Lowe and the other written by the attending nurse, "make no mention of any request to examine [Plaintiff's] arm or any refusal by [Plaintiff]" to permit Dr. Lowe to do so.  (Vives Aff. ¶ 18.)  After Dr. Lowe refused to allow Plaintiff to return to work on February 28, 2013, Plaintiff requested that she be evaluated by an HMD doctor other than Dr. Lowe.  (Vives Aff. ¶ 11.)  Plaintiff's request was granted, and, after a second evaluation, Plaintiff returned to full duty in the laundry on March 7, 2013.  (*Id.*; Lowe Dep. 186:24–187:4, 193:2–6.)

Plaintiff testified that during her absence from May 29, 2012 to March 7, 2013, she stayed inside twenty hours a day, seven days a week "in accordance with the DOC rules." (Vives Dep. 69:23–70:6.) Plaintiff was paid during her absence. (*Id.* at 111:9–19.)

### b. Plaintiff's termination

Dr. Richard Leinhardt, the Administrative Chief Surgeon of the DOC, testified at his deposition that at some point during Plaintiff's absence, the DOC filed an application with the New York City Employees' Retirement System ("NYCERS") seeking "disability retirement" for Plaintiff because "she was considered disabled." (Dep. of Richard R. Leinhardt ("Leinhardt Dep.") 55:20–56:3, annexed to Risk Decl. as Ex. 4, Docket Entry No. 36-4; *see also* Pl. 56.1 ¶¶ 175–77.) The DOC considered Plaintiff to be disabled "based on the documentation provided by . . . her treating physician which said . . . that she could not perform full-duty functions," (Leinhardt Dep. 56:7–11), which include "standing . . . up [for] 8 ½ hours continuously; . . . lifting heavy objects; [and] moving heavy items," (Correction Officer Job Description 674, annexed to Murrell Decl. as Ex. BB, Docket Entry No. 35-30.)

On January 7, 2013, the DOC issued a Memorandum of Complaint ("MOC") against Plaintiff, indicating that her use of sick leave from May 29, 2012 to January 7, 2013, "demonstrated her incompetence to perform the functions of Corrections Officer[s]" and recommending that the DOC terminate Plaintiff. (Defs. 56.1 ¶¶ 78, 80; Pl. 56.1 ¶¶ 78, 80; January 7, 2013 MOC, annexed to Murrell Decl. as Ex. R, Docket Entry No. 35-20.)

Beginning on March 24, 2014, Plaintiff had a trial before the New York City Office of Administrative Trials and Hearings ("OATH") regarding the January 7, 2013 MOC. (Defs. 56.1 ¶¶ 86, 90; Pl. 56.1 ¶¶ 86, 90.) Two other disciplinary charges were also tried with the January 7,

2013 charge.[3]  (Defs. 56.1 ¶ 86; Pl. 56.1 ¶ 86.)  By report dated April 17, 2014, Administrative

Law Judge Alessandra F. Zorgniotti (the "ALJ") found that the DOC had proven all charges, and

recommended that the DOC terminate Plaintiff for "medical incompetence."  (Defs. 56.1 ¶¶ 94,

96; Pl. 56.1 ¶¶ 94, 96; Report and Recommendation 11, annexed to Murrell Decl. as Ex. F,

Docket Entry No. 35-8 ("While [Plaintiff's] insubordination and false reporting merit a penalty

less than termination, [Plaintiff's] medical incompetence must be given considerable weight in

this analysis.").)  The ALJ's report and recommendation explained that Plaintiff was "charged

with being 'unable to perform the full range of duties of her position as a correction officer'

because of excessive absenteeism."  (Report and Recommendation 3.)  The ALJ found that

"[a]though [Plaintiff] provided valid documentation for her continued absence, the presence of

medical documentation does not mitigate the charge, since the absence itself is the offense."

(*Id.*)  The ALJ also found that before Plaintiff's prolonged absence, she was "given an

unambiguous order to submit documentation upon her return to work [after caring for her sick

mother] and that she failed to do so until five days later," and that Plaintiff's disciplinary charge

for insubordination should therefore be sustained.  (*Id.* at 4.)  Finally, the ALJ found that the

disciplinary charge for failing to comply with her supervisors' orders, inefficiency performing

her duties, engaging in conduct unbecoming an officer, and filing a false report, arising out of

events occurring on June 9, 2011, should be sustained.  (*Id.* at 5–10.)  The DOC Trials &

---

[3]  On June 29, 2011, Plaintiff was charged with violating "DOC Rule Nos. 3.20.070
(members of the department shall promptly obey all lawful orders of their supervisors); 3.20.030
(making a false official statement); 2.30.020 (give every assistance possible in furthering the
work at the command); and 3.05.010 (performing work efficiently)."  (Defs. 56.1 ¶¶ 26, 28; Pl.
56.1 ¶¶ 26, 28.)  On March 28, 2012, Plaintiff was charged with violating "DOC Rule Nos.
3.20.070 ([m]embers of the [d]epartment shall promptly obey all lawful orders of their
[s]upervisors); and 4.30.020 (failure to submit a report/documentation when one is required)."
(Defs. 56.1 ¶¶ 34–35; Pl. 56.1 ¶¶ 34–35.)

Litigation Division recommended that the DOC adopt the ALJ's findings and penalty recommendation.  (Defs. 56.1 ¶ 98; Pl. 56.1 ¶ 98.)  On September 9, 2014, DOC Commissioner Joseph Ponte terminated Plaintiff's employment.  (Defs. 56.1 ¶ 99; Pl. 56.1 ¶ 99.)

### c.  Plaintiff's administrative complaint

On November 25, 2014, Plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR") alleging "unlawful discriminatory practice relating to employment because of . . . race and gender, and retaliation" in violation of the New York State Human Rights Law, N.Y. Exec. Law § 296(15) ("NYSHRL").  (NYSDHR Verified Compl. 5, annexed to Murrell Decl. as Ex. G, Docket Entry No. 35-9; *see also* Defs. 56.1 ¶ 126; Pl. 56.1 ¶ 126.)  In her NYSDHR complaint, Plaintiff alleged that on May 28, 2012, she "called in sick due to injuries," and on May 30, 2012, "according to protocol, [she] reported to [HMD] to inform them about her accident."  (NYSDHR Verified Compl. 2.)  The complaint also explains that the "second time [Plaintiff] met with [Dr. Lowe], [Dr.] Lowe acted unprofessionally and yelled at [Plaintiff] exclaiming, 'I can read!' after [Plaintiff] tried to point her to a letter she had brought from [her] treating physician."  (*Id.* at 3.)  Plaintiff also stated in her NYSDHR complaint that "after each visit, [Dr.] Lowe determined that [Plaintiff] was not fit to return to work" even though "Dr. Gupta stated in her notes that [Plaintiff] had limitations, but . . . was fit to return to work."  (*Id.*)  In addition, Plaintiff states that "[w]hile [she] did have an injured thumb and wrist, she was fit to return to work under the [MMR] classification, but was denied the opportunity to do so" even though Plaintiff "would have been able to write, answer phones, push buttons, and sort papers."  (*Id.*)  The NYSDHR complaint also states that on May 8, 2013, "two months after returning to work," [a captain] called [Plaintiff] into his office and served her with a charge as being 'medically incompetent'" and that the ALJ "rendered a decision on April 17, 2014 to

terminate [Plaintiff] for violating a [d]irective that subjects employees who are out of work for more than 40 days to termination." (*Id.* at 4.)

### d. Plaintiff's alleged comparators

Plaintiff contends that the DOC discriminated against her by refusing to return her to work and then terminating her, and that other corrections officers, who are male and non-Hispanic, were permitted to return to work on MMR status and/or were not terminated as a result of their medical absences. (Pl. 56.1 ¶¶ 100, 232–34.) In support of these contentions, Plaintiff states that (1) Michael Koebel was absent on medical leave for ninety-two days in 2010 and ninety-seven days in 2015 and then placed on MMR for two months following each medical absence; (2) Louis Cretella was absent for 168 days in 2010 and 2011; (3) Michael Delzatto was absent on medical leave for eleven days in 2014 and then placed on MMR for approximately 120 days; (4) Richard Savarese was absent on medical leave for 137 days between 2013 and 2014 and then placed on MMR for two months; (5) Robert Stalanski was absent on medical leave for 116 days between 2012 and 2013 and then placed on MMR for one month; (6) Ronald Bitting was absent for 240 days in 2012 and 2013 and then retired in 2013; (7) Roy Wayson was absent for 138 days in 2012; and (8) William Reph was absent on medical leave for 201 days between 2011 and 2012 and then placed on MMR for one month. (*Id.* ¶ 232.) Plaintiff contends that none of these individuals were subjected to an MOC, terminated, or disciplined in connection with their medical absences. (*Id.* ¶ 234.) As to Savarese, Plaintiff contends that when he returned to work on MMR status in 2014, he walked with a cane and was assigned to a position in the laundry where he supervised inmates from a glass-walled office. (*Id.* ¶ 233.) Each of these alleged comparators worked in the Support Services Division and were therefore subject to the same disciplinary standards as Plaintiff. (*Id.* ¶ 232.)

Defendants contend that after its investigation of Plaintiff's NYSDHR complaint, the NYSDHR "noted [that] Michael Koebel, Robert Stalanski, Roy Wayson, and Louis Cretella did not have comparable number of days absent from 2012 [to] 2013." (Defs. 56.1 ¶ 130.)

### e. Relevant DOC policies

Pursuant to DOC policy, corrections officers on medical leave continue to receive their full salary. (Pl. 56.1 ¶ 142; Defs. Reply 56.1 ¶ 142.) However, employees on paid medical leave must remain confined to their homes for all but four hours per day. (Pl. 56.1 ¶ 142; Defs. Reply 56.1 ¶ 142.) Further, an employee who is on medical leave for more than forty days within a twelve-month period may be subject to termination due to excessive absenteeism. (Defs. 56.1 ¶ 41; Pl. 56.1 ¶ 41.) DOC employees may also take FMLA leave for up to twelve weeks without pay. (DOC Employee Rules and Regs. 711, annexed to Murrell Decl. as Ex. Y, Docket Entry No. 35-27.)

## II. Discussion

### a. Standard of review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018); *see also Cortes v. MTA NYC Transit*, 802 F.3d 226, 230 (2d Cir. 2015). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury

could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the nonmoving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### b. Timeliness of Plaintiff's Title VII and ADA claims

Defendants assert that because Plaintiff filed her complaint with the NYSDHR on November 25, 2014, "any Title VII and ADA claim arising before January 29, 2014," *i.e.*, 300 days prior to the filing of the NYSDHR complaint, is "untimely." (Defs. Mem. 3.)

Plaintiff argues that "the adverse employment action at issue is termination," and that because she was terminated on September 9, 2014 and filed her NYSDHR complaint "within weeks thereafter," her Title VII and ADA claims are timely. (Pl. Opp'n 15.) Plaintiff also argues that, in adjudicating her Title VII and ADA claims, the Court may consider "relevant conduct occurring prior to the statutory limitations period," *i.e.*, more than 300 days before Plaintiff's administrative charge, as "background evidence." (*Id.* at 15, 16.)

Before bringing a federal claim under Title VII or the ADA, a plaintiff must first file a complaint with the EEOC or equivalent state agency. 42 U.S.C. § 2000e-5(e)(1); *Duplan v. City of New York*, 888 F.3d 612, 624 (2d Cir. 2018) ("Exhaustion is 'an essential element of Title VII's statutory scheme.'" (quoting *Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 489 (2d Cir. 2018))); *Rasko v. N.Y.C. Admin. for Children's Servs.*, 734 F. App'x 52, 54 (2d Cir. 2018) ("Under Title VII, a plaintiff in New York must file a complaint with the EEOC within 300 days of a discriminatory act." (first citing 42 U.S.C. § 2000e-5(e)(1) and then citing *Pikulin v. City Univ. of N.Y.*, 176 F.3d 598, 599 (2d Cir. 1999))); *Boonmalert v. City of New York*, 721 F.

App'x 29, 31 (2d Cir. 2018) ("A plaintiff seeking to recover under the ADEA must file a discrimination charge with a state agency within 300 days of the occurrence of the allegedly unlawful employment practice." (quoting *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007))); *Roy v. Buffalo Philharmonic Orchestra*, 684 F. App'x 22, 23 (2d Cir. 2017) ("A plaintiff raising an ADA claim of discrimination must exhaust all administrative remedies by filing an EEOC charge within 300 days of the alleged discriminatory conduct." (citing *Tewksbury v. Ottaway Newspapers*, 192 F.3d 322, 325 (2d Cir. 1999))). The 300-day period serves as a statute of limitations; claims regarding acts that occurred more than 300 days prior to the employee's filing a charge of discrimination with the agency are thus time-barred. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 79 (2d Cir. 2015); *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 125–26 (2d Cir. 2010); *Klein v. N.Y. Univ.*, No. 07-CV-0160, 2008 WL 3843514, at *2 (S.D.N.Y. Aug. 14, 2008) (citing *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001)).

However, allegations concerning conduct that took place during the time-barred period may be considered as "'background evidence' in evaluating the merits of [a plaintiff's] discrimination claims." *Davidson v. LaGrange Fire Dist.*, 523 F. App'x 838, 839 (2d Cir. 2013) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 112 (2002)); *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 150 (2d Cir. 2012) (explaining that background evidence from outside the limitations period "may be considered to assess liability on the timely alleged act" (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 177 (2d Cir. 2005))); *Marzano v. S. New England Tel. Co.*, No. 16-CV-1274, 2018 WL 4341149, at *2 (D. Conn. Sept. 10, 2018) ("Of course, evidence of prior events may be considered for background purposes to the extent that they may shed light on the significance of events occurring within the statute of limitations

period."); *Johnson v. Conn. Dep't of Admin. Servs. Bureau of Enter. Sys. & Tech.*, No. 17-CV-00901, 2018 WL 306697, at *4 (D. Conn. Jan. 5, 2018) ("[A]ny adverse acts that occurred prior to [the statute of limitations period] may be considered . . . only as background evidence to support any non-time-barred acts of discrimination or retaliation."); *Imperato v. Otsego Cty. Sheriff's Dep't*, No. 13-CV-1594, 2016 WL 1466545, at *14 (N.D.N.Y. Apr. 16, 2016) ("The statute of limitations does not . . . bar an employee from using . . . prior acts as background evidence in support of a timely claim." (citing *Nat'l R.R. Passenger Corp.*, 536 U.S. at 113)).

Plaintiff's administrative charge was filed on November 25, 2014. (Defs. 56.1 ¶ 126; Pl. 56.1 ¶ 126.) Because claims regarding acts that occurred more than 300 days before the administrative charge are time-barred, *Vega*, 801 F.3d at 79, for Plaintiff's claims to be timely, she must allege conduct occurring after January 29, 2014. Plaintiff's discrimination claims concerning her termination are therefore timely, as Plaintiff was terminated on September 9, 2014, (Defs. 56.1 ¶ 2; Pl. 56.1 ¶ 2). However, Plaintiff's claims arising out of conduct that took place before January 29, 2014, *e.g.*, Dr. Lowe's refusal to return Plaintiff to work, are untimely and thus will only be considered as background evidence "to assess liability on the timely alleged facts," *Chin*, 685 F.3d at 150.

### c.  Plaintiff's ADA claim

#### i.  Exhaustion of administrative remedies

Defendants assert that "[b]ecause [P]laintiff admittedly did not claim discrimination on the basis of her disability in the [NY]SDHR charge," her "ADA claims are unexhausted and must be dismissed." (Defs. Mem. 3.)

Plaintiff contends that, although she did not specifically assert disability discrimination in her administrative complaint, because her ADA claim is "reasonably related" to the claims filed

with the agency, she has exhausted her ADA claim.  (Pl. Opp'n 13–15.)

"[C]laims not raised in an EEOC complaint may still be part of the complaint later filed in federal court 'if they are "reasonably related" to the claim filed with the agency.'"  *Littlejohn v. City of New York*, 795 F.3d 297, 322 (2d Cir. 2015) (quoting *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 69 (2d Cir. 2006)); *see also Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001) (same).  "Reasonably related" claims are recognized in three situations: where (1) the alleged discriminatory conduct "would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination"; (2) the claim is one of "retaliation by an employer against an employee for filing an EEOC charge"; and (3) the plaintiff "alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge."  *Terry v. Ashcroft*, 336 F.3d 128, 151 (2d Cir. 2003) (citation and internal quotation marks omitted); *see also Littlejohn*, 795 F.3d at 322 ("A claim is reasonably related to the filed claim 'if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made.'" (quoting *Deravin v. Kerik*, 335 F.3d 195, 200–01 (2d Cir. 2003))).  "The central question is whether the complaint filed with the EEOC gave that agency adequate notice."  *Williams*, 458 F.3d at 70 (citation and internal quotation marks omitted); *see also Hoffman v. Williamsville Sch. Dist.*, 443 F. App'x 647, 649 (2d Cir. 2011) ("A new allegation will be considered reasonably related if the administrative charge provided the EEOC with sufficient notice to investigate the allegation.").  Courts look at "factual allegations made in the EEOC charge itself, describing the discriminatory conduct about which a plaintiff is grieving" to determine whether the claims are reasonably related.  *Littlejohn*, 795 F.3d at 322 (alteration omitted) (quoting *Deravin*, 335 F.3d at 201); *Carby v. Holder*, No. 11-CV-5775, 2013 WL

3481722, at *5 (S.D.N.Y. July 10, 2013) ("Th[e] [exhaustion] analysis is 'intimately connected to the facts asserted in the EEOC complaint,' and does not depend on the boxes checked or labels applied by the plaintiff in the EEOC complaint." (quoting *Williams*, 458 F.3d at 71)).

Plaintiff's administrative complaint alleging race and gender discrimination and retaliation is reasonably related to her ADA claim because the conduct complained of "would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge[s]" that Plaintiff alleged, *Littlejohn*, 795 F.3d at 322.

Plaintiff alleged in the NYSDHR complaint that after her wrist injury, she requested to return to work but was prohibited from doing so. (NYSDHR Verified Compl. 3.) Plaintiff alleged that she "was fit to return to work" on MMR status and could complete tasks such as writing, answering telephones, pushing buttons, and sorting papers. (*Id.*) The complaint also states that on May 8, 2013, "two months after returning to work," [a captain] called [Plaintiff] into his office and served her with a charge as being 'medically incompetent'" and that the ALJ "rendered a decision on April 17, 2014 to terminate [Plaintiff] for violating a [d]irective that subjects employees who are out of work for more than 40 days to termination." (*Id.* at 4.) These allegations are sufficient to have given the agency "adequate notice," of Plaintiff's disability discrimination claim, *Williams*, 458 F.3d at 70, as the NYSDHR complaint described Plaintiff's disability and the allegedly wrongful actions that her employer undertook in response to her disability. *See Littlejohn*, 795 F.3d at 322 (stating that courts look at "factual allegations made in the EEOC charge itself, describing the discriminatory conduct about which a plaintiff is grieving" to determine whether the claims are reasonably related (alteration and citation omitted)); *Ximines v. George Wingate High Sch.*, 516 F.3d 156, 158–59 (2d Cir. 2008) (holding that the plaintiff's age discrimination claim alleging failure to promote reasonably related to

other age-related claims asserted in administrative complaint because administrative complaint "made clear that [the plaintiff] complained of age discrimination in several efforts to secure [a] promotion"); *Williams*, 458 F.3d at 71 (concluding that "because the factual underpinnings" of the plaintiff's claim were presented in the plaintiff's EEOC complaint, the plaintiff had exhausted her administrative remedies); *Jones v. N.Y.C. Dep't of Educ.*, 286 F. Supp. 3d 442, 448 (E.D.N.Y. 2018) (finding the plaintiff's retaliation claim to be exhausted because even though the "plaintiff did not 'check the box' for retaliation, he pleaded enough facts in his [administrative] complaint to put the EEOC on notice of retaliatory conduct"). Plaintiff's ADA claim is therefore properly exhausted.

### ii. ADA discrimination claim

Defendants argue that Plaintiff cannot establish a prima facie case of discrimination under the ADA because she is not disabled within the meaning of the ADA and because she has not established an inference of discrimination based on her disability. (Defs. Mem. 7–12.) In addition, Defendants argue that even if the Court finds that Plaintiff has established a prima facie case, Defendants have proffered a legitimate, nondiscriminatory reason for Plaintiff's termination and Plaintiff cannot establish that the proffered legitimate, nondiscriminatory reason for terminating her was pretextual. (*Id.* at 13–16, 17.)

Plaintiff argues that she has established a prima facie case of disability discrimination, Defendants cannot show any legitimate nondiscriminatory reason for her termination, and any such reason is pretextual. (*Id.* 17–26.)

Claims of employment discrimination under the ADA are assessed using the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Cortes*, 802 F.3d at 231. Under that framework, a plaintiff must first

establish a prima facie case of discrimination. *Id.*; *see also McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013). A plaintiff's burden at this stage is "minimal." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 171 (2d Cir. 2006); *see also Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16, 20 (2d Cir. 2015) (same). If the plaintiff satisfies this initial burden, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Cortes*, 802 F.3d at 231. The defendant's burden "is not a particularly steep hurdle." *Whethers v. Nassau Health Care Corp.*, 956 F. Supp. 2d 364, 375 (E.D.N.Y. 2013), *aff'd* 578 F. App'x 34 (2d Cir. 2014). It "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). If the defendant articulates such a reason, the burden shifts back to the plaintiff to show that the defendant's reason was pretext for the discrimination. *Cortes*, 802 F.3d at 231; *see also Tillery v. N.Y. State Office of Alcoholism & Substance Abuse Servs.*, 739 F. App'x 23, 25 (2d Cir. 2018) ("[T]he plaintiff must present 'admissible evidence that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.'" (alteration omitted) (citing *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 80 (2d Cir. 2009))); *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 156 (2d Cir. 2010) ("[A] plaintiff need only show that the defendant was in fact motivated at least in part by the prohibited discriminatory animus.").

### 1. Prima facie case

To establish a prima facie case of discrimination under the ADA, a plaintiff must show that "(1) the employer is subject to the ADA; (2) the plaintiff is disabled within the meaning of the ADA or perceived to be so by her employer; (3) she was otherwise qualified to perform the

essential functions of the job with or without reasonable accommodation; (4) she suffered an adverse employment action; and (5) the adverse action was imposed because of her disability." *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015); *see also Vitti v. Macy's Inc.*, --- F. App'x ----, ----, No. 17-CV-3493, 2018 WL 6721091, at *2 (2d Cir. Dec. 21, 2018) (same).

Defendants do not dispute that they are subject to the ADA, that Plaintiff was qualified to perform the essential functions of the job with or without reasonable accommodation, or that Plaintiff's termination was an adverse employment action. Defendants only contest whether Plaintiff is disabled, and whether the DOC terminated her because of a disability.

### A. Plaintiff is disabled within the meaning of the ADA

Defendants argue that Plaintiff cannot establish a prima facie case of discrimination under the ADA because she is not disabled within the meaning of the ADA or perceived to be disabled by her employer. (Defs. Mem. 11–12.) In support of their argument, Defendants contend that (1) "[P]laintiff has not claimed that her injury had a permanently limiting effect on her ability to perform or engage in major life activities," (*id.* at 11), and (2) "there is no evidence the DOC regarded [P]laintiff as having a disability," (*id.* at 12).

Plaintiff argues that she can establish that she is disabled within the meaning of the ADA because the DOC has "acknowledged that it regarded [her] as disabled after her hand injury." (Pl. Opp'n 17; *see also id.* at 19, 22–25.)

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking,

communicating, and working." *Id.* § 12102(2)(A); *see also Ray v. Weit*, 708 F. App'x 719, 721 (2d Cir. 2017); *Dooley*, 636 F. App'x at 21. Under the EEOC's regulations, "'[t]he term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA' and 'is not meant to be a demanding standard.'" *Parada v. Banco Industrial De Venezuela, C.A.*, 753 F.3d 62, 66 n.3 (2d Cir. 2014) (quoting 29 C.F.R. § 1630.2(j)(1)(i)); *see also B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 161 n.10 (2d Cir. 2016) (same). As a result, "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Kopchik v. Town of E. Fishkill, N.Y.*, No. 18-CV-1182, --- F. App'x ----, ----, 2018 WL 6767369, at *4 (2d Cir. Dec. 26, 2018) (quoting *Parada*, 753 F.3d at 69 n.3 (quoting 29 C.F.R. § 1630.2(j)(1)(ii))).

Even absent an actual or recorded disability, an employee is still disabled if the employee is "regarded as having such an impairment." 42 U.S.C. § 12102(1)(C). Prior to the ADA's 2008 amendment, a plaintiff who was "regarded as" disabled had to show that the employer regarded the plaintiff as having an impairment that substantially limited a major life activity. *See Hilton v. Wright*, 673 F.3d 120, 128–29 (2d Cir. 2012) (discussing pre-amendment standard for assessing "regarded as" claims). However, as amended, an employee need not show that the employer perceived both the impairment and that it substantially limited a major life activity; instead:

> An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

42 U.S.C. § 12102(3)(A); *Hilton*, 673 F.3d at 129 (finding that under the amended ADA, the employee only had to show that the employer "regarded him as having a mental or physical impairment . . . [and] was not required to present evidence of how or to what degree [the

employer] believed the impairment affected him"); *Gentleman v. State Univ. of N.Y.–Stony Brook*, No. 16-CV-2012, 2017 WL 2468963, at \*4 (E.D.N.Y. June 6, 2017) ("Notably, . . . the ADA Amendments Act of 2008 ('ADAAA') set forth a new, more lenient, standard for determining whether an individual is 'regarded as disabled.'"); *Rodriguez v. Verizon Telecom*, No. 13-CV-6969, 2014 WL 6807834, at \*5 (S.D.N.Y. Dec. 3, 2014) ("The ADAAA added a paragraph that exempts 'regarded as' claimants from being compelled to demonstrate that the disability they are perceived as having substantially limits a major life activity."); *Darcy v. City of New York*, No. 06-CV-2246, 2011 WL 841375, at \*4 (E.D.N.Y. Mar. 8, 2011) ("'[B]eing regarded as having' an impairment is singled out as a distinct, alternative definition of disability, and individuals making such a claim are expressly relieved of having to show an actual or the perception of an actual impairment.").

"Whether an individual is 'regarded as' having a disability 'turns on the employer's perception of the employee' and is therefore 'a question of intent, not whether the employee has a disability.'" *Simmons v. N.Y.C. Transit Auth.*, 340 F. App'x 24, 27 (2d Cir. 2009) (quoting *Francis v. City of Meriden*, 129 F.3d 281, 284 (2d Cir. 1997)). However, "the 'regarded as' definition of disability does not apply to impairments that are both 'transitory and minor,'" *Jordan v. Forfeiture Support Assocs.*, 928 F. Supp. 2d 588, 606 (E.D.N.Y. 2013) (quoting 42 U.S.C. § 12102(3)(B)), which the statute defines as impairments with "an actual or expected duration of [six] months or less," 42 U.S.C. § 12102(3)(B); *see also Rios v. Core Facility Servs. LLC*, No. 16-CV-1748, 2018 WL 1545684, at \*19 (E.D.N.Y. Mar. 29, 2018) (ADA plaintiffs "may not base their perceived disability claim upon 'impairments that are transitory and minor.'" (quoting 42 U.S.C. § 12102(3)(B)).

Drawing all reasonable inferences in Plaintiff's favor, a rational juror could find that

Plaintiff has shown that she was "regarded as" being disabled by Defendants. First, Dr. Lowe testified that she did not know where Plaintiff's "medical problem was headed," and did not place Plaintiff on MMR status because that status is "a temporary assignment" reserved for employees whose condition is "expected to just last a few months." (Lowe Dep. 123:3–7, 147:5–148:3.) Second, Dr. Leinhardt, the Administrative Chief Surgeon of the DOC, testified that the DOC considered Plaintiff "disabled based on the documentation provided by . . . her treating physician which said . . . that she could not perform full-duty functions," which included "standing up for 8 ½ hours continuously," "lifting heavy objects," and "moving heavy items." (Leinhardt Dep. 56:7–11; Correction Officer Job Description 674.) In addition, Dr. Leinhardt testified that the DOC filed an application seeking "disability retirement" for Plaintiff because "she was considered disabled." (Leinhardt Dep. 55:20–56:3.) Based on Dr. Lowe's testimony, a rational juror could infer that Plaintiff's disability was more than "transitory" or "minor," *i.e.*, it had an expected duration of more than six months, *Jordan*, 928 F. Supp. 2d at 606; 42 U.S.C. § 12102(3)(B), and based on Dr. Leinhardt's testimony, a reasonable juror could conclude that Plaintiff was "regarded as having . . . an impairment" that "substantially limit[ed] one or more major life activities," 42 U.S.C. § 12102(1), including walking, standing, lifting, bending, or working, 42 U.S.C. § 12102(2)(A). *See, e.g.*, *Simmons*, 340 F. App'x at 27 (finding that jury was entitled to find that plaintiff was regarded as disabled where she was taken off duty and presented evidence that her employer believed that when symptomatic, her impairment was severe); *Jordan*, 928 F. Supp. 2d at 606–07 (finding that the plaintiff had adequately pled that she was regarded as disabled where she provided medical documentation to her employer and her employer advised that she take disability leave instead of worker's compensation); *Primmer v. CBS Studios, Inc.*, 667 F. Supp. 2d 248, 258 (S.D.N.Y. 2009) (finding that the plaintiff

provided sufficient evidence to show that her employer regarded her as disabled where she presented evidence that shortly after her release from the hospital, the plaintiff's supervisor indicated that the plaintiff's capacity to work was no longer satisfactory).

### B. Plaintiff has established an inference of discrimination based on her disability

Defendants argue that Plaintiff has not established an inference of discrimination under the ADA for three reasons: (1) Plaintiff has not alleged that she heard anyone make "invidious comments about people with disabilities, or those who use FMLA leave," much less anyone with decision-making power, (Defs. Mem. 8); (2) Plaintiff's alleged comparators are not sufficiently similar to Plaintiff because none reported sick more than forty days within a twelve-month period more than three times and because there is no evidence that Plaintiff or any of her comparators were disabled under the ADA, (*id.* at 10); and (3) Plaintiff "testified to only one example of alleged disability discrimination based on disparate treatment, which was her inability to return to work when she wanted following her arm injury," an "illogical" claim, since the prognosis given by her private physician was admittedly "guarded," (*id*).

Plaintiff argues that she can show an inference of discrimination because Defendants have "acknowledged that [they] . . . terminated [Plaintiff's] employment on the grounds that she was 'medically incompetent' specifically because of the nine months absence [that Defendants] had caused." (Pl. Opp'n 17–18.)

Inference of discrimination "is a 'flexible [standard] that can be satisfied differently in differing factual scenarios.'" *Saji v. Nassau Univ. Med. Ctr.*, 724 F. App'x 11, 17 (2d Cir. 2018) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)). "No one particular type of proof is required to show that [p]laintiff's termination occurred under circumstances giving rise to an inference of discrimination." *Moore v. Kingsbrook Jewish Med.*

*Ctr.*, No. 11-CV-3625, 2013 WL 3968748, at *6 (E.D.N.Y. July 30, 2013) (citation omitted); *see also Chertkova*, 92 F.3d at 91 ("[T]here is no unbending or rigid rule about what circumstances allow an inference of discrimination."). An inference of discrimination can be drawn from circumstances such as "the employer's criticism of the plaintiff's performance in . . . degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's [adverse employment action]," *Franchino v. Terence Cardinal Cook Health Care Ctr., Inc.*, 692 F. App'x 39, 41 (2d Cir. 2017) (citing *Littlejohn*, 795 F.3d at 312); *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) (same), or by "showing that an employer treated [an employee] less favorably than a similarly situated employee outside his protected group," *Toussaint v. NY Dialysis Servs., Inc.*, 706 F. App'x 44, 45 (2d Cir. 2017) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). "In assessing the record to determine whether there is a genuine issue to be tried," a court is obliged to "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 87 (2d Cir. 2016) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999)).

Drawing all reasonable inferences in Plaintiff's favor, the evidence before the Court indicates that Plaintiff was terminated because of her prolonged absence, and that Defendants were aware that Plaintiff's absence was caused by her medical condition. On January 7, 2013, the DOC issued an MOC against Plaintiff indicating that her use of sick leave from May 29, 2012 to January 7, 2013 "demonstrated her incompetence to perform the functions of a Corrections Officer," and recommended that the DOC terminate Plaintiff. (Defs. 56.1 ¶¶ 78, 80;

Pl. 56.1 ¶¶ 78, 80; January 7, 2013 MOC.)  Plaintiff was subsequently terminated for "medical

incompetence."  (Defs. 56.1 ¶¶ 94, 96; Pl. 56.1 ¶¶ 94, 96; Report and Recommendation 11.)

Further, the ALJ recommendation specifically notes that Plaintiff was absent due to a medical

condition, but because "the absence itself is the offense," the presence of a medical condition

(supported by medical documentation) "does not mitigate the charge."  (Report and

Recommendation 3.)  Under these circumstances, Plaintiff has demonstrated an inference of

discrimination because she has shown a direct causal connection between her disability and her

termination — she was terminated because of her absence and she was absent because of her

medical condition.  *See Hampson v. State Farm Mut. Auto Ins. Co.*, No. 12-CV-00258, 2015 WL

12733387, at *15 (N.D.N.Y. Mar. 26, 2015) (finding an inference of discrimination where

"absences were the cause of [the plaintiff's] termination" and the "absences were a manifestation

of her disability"); *McCowan v. HSBC Bank USA, N.A.*, 689 F. Supp. 2d 390, 409–10 (E.D.N.Y.

2010) (employee sufficiently showed causation where she offered evidence that defendant

regarded her as unable to perform certain job functions and terminated her as a result); *see also*

*Morris v. City of New York*, 153 F. Supp. 2d 494, 502 (S.D.N.Y. 2001) ("Where the employer

was aware that an employee's absences were related to a disability . . . the employee's

attendance record may be an impermissible pretext for the employee's [termination]."); *Barnett*

*v. Revere Smelting & Ref. Corp.*, 67 F. Supp. 2d 378, 392 (S.D.N.Y. 1999) ("[W]here an

employer asserts excessive absenteeism as a non-discriminatory justification for an employee's

termination, that justification cannot analytically be considered apart from the alleged disability

causing the absenteeism.").[4]

---

[4]  Because the Court concludes that Plaintiff has provided sufficient evidence of an
inference of discrimination, the Court declines to consider Plaintiff's argument that the DOC
policy is a *per se* violation of the ADA.

## 2.    Defendants' nondiscriminatory reason

Defendants argue that they have established a legitimate, nondiscriminatory reason for Plaintiff's termination — the two command disciplines that Plaintiff received before she was injured, and her excessive absenteeism after her injury.  (Defs. Mem. 13–15.)

Plaintiff argues that she was terminated for "medical incompetence," not because of her "minor disciplinary record."  (Pl. Opp'n 29–30.)

Once the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions.  *St. Mary's Honor Ctr.*, 509 U.S. at 506–07; *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010).  An employer's "'explanation of its reasons must be clear and specific' in order to 'afford the employee a full and fair opportunity to demonstrate pretext.'"  *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 105 (2d Cir. 2001) (quoting *Meiri v. Dacon*, 759 F.2d 996–97 (2d Cir. 1985)).  "If the defendant proffers such a reason, the presumption of discrimination drops out of the analysis, and the defendant will be entitled to summary judgment unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination."  *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) (alterations and citation omitted).

Plaintiff's two command disciplines and excessive absenteeism serve as a legitimate, nondiscriminatory reason for her termination.  *See Clark v. Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237, 254 (S.D.N.Y. 2015) (disciplinary reports a nondiscriminatory reason for termination); *Colon v. Fashion Inst. of Tech. (State Univ. of N.Y.)*, 983 F. Supp. 2d 277, 287 (S.D.N.Y. 2013) (tardiness and absence a sufficient nondiscriminatory reason for termination); *Henny v. New York State*, 842 F. Supp. 2d 530, 554 (S.D.N.Y. 2012) (same); *Primmer*, 667 F. Supp. 2d at 260 (unsatisfactory job performance is a legitimate, nondiscriminatory reason).  As a

result, unless Plaintiff can show that Defendants' articulated reasons for her termination are pretext for discrimination, Defendants are entitled to summary judgment on Plaintiff's ADA claim. *See Spiegel*, 604 F.3d at 80 (explaining that if the defendant proffers a nondiscriminatory reason, the defendant is entitled to summary judgment unless the plaintiff can show pretext).

### 3. Plaintiff has established pretext

Defendants argue that Plaintiff cannot show that their reasons for terminating her employment are pretextual "for the same reasons that Plaintiff . . . is unable to establish an inference of discriminatory intent." (Defs. Mem. 17.)

Plaintiff argues that Defendants have acknowledged that they terminated her because of her absence (which was caused by her disability), and not because of the command disciplines that she received. (Pl. Opp'n 21–22.)

A plaintiff may show pretext "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, [nondiscriminatory] reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 430 (2d Cir. 2016) (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)); *see also Reeves*, 530 U.S. at 147 ("Proof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."); *Doe v. Bd. of Educ. of Fallsburgh Cent. Sch. Dist.*, 63 F. App'x 46, 49–50 (2d Cir. 2003) ("Evidence that could permit a jury to believe that the defendant's proffered reasons are not believable can support an inference that they are pretexts for discrimination."); *Pediford–Aziz v. City of New York*, 170 F. Supp. 3d 480, 486 (E.D.N.Y. 2016) ("From . . . implausibilities, inconsistencies, and contradictions in the proffered

reasons . . . one could conclude that . . . explanations [are] pretext." (alterations, citation, and internal quotation marks omitted)).

When making this assessment, courts "are decidedly not interested in the truth of the allegations against [the] plaintiff" but rather "are interested in what *motivated* the employer." *Toussaint*, 706 F. App'x at 45–46 (quoting *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006)); *see also Eisner v. Cardozo*, 684 F. App'x 29, 31 (2d Cir. 2017) (noting that the pretext inquiry is "decidedly not interested in the truth of the allegations against [a plaintiff, but only] in what *motivated* the employer" (quoting *McPherson*, 457 F.3d at 216)); *Graham*, 230 F.3d at 44 (holding that the plaintiff could not establish pretext by demonstrating that the results of a failed drug test were not "actually correct" because "[t]he key question is whether it was reasonable for the employer to rely on the test result in making its employment decision"); *Hartley v. Rubio*, 785 F. Supp. 2d 165, 177 (S.D.N.Y. 2011) ("In determining whether the articulated reason for the action is a pretext, 'a fact-finder need not, and indeed should not, evaluate whether a defendant's stated purpose is unwise or unreasonable. Rather, the inquiry is directed toward determining whether the articulated purpose is the actual purpose for the challenged employment-related action.'" (quoting *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 170–71 (2d Cir. 1993)); *Koleskinow v. Hudson Valley Hosp. Ctr.*, 622 F. Supp. 2d 98, 111 (S.D.N.Y. 2009) ("Where a plaintiff has been terminated for misconduct, the question is not whether the employer reached a correct conclusion in attributing fault [to the plaintiff] . . . , but whether the employer made a good-faith business determination." (internal quotation marks omitted)); *Rodriguez v. City of New York*, 644 F. Supp. 2d 168, 187–88 (E.D.N.Y. 2008) ("[T]he fact that an employee disagrees with the results of an employer's decision regarding termination, or even has evidence that the decision was objectively incorrect or was based on a faulty

investigation, does not automatically demonstrate, by itself, that the employer's proffered reasons are a pretext for termination."); *Argueta v. N. Shore Long Island Health Sys., Inc.*, No. 01-CV-4031, 2003 WL 22670915, at *5 (E.D.N.Y. Nov. 6, 2003) (where employer's alleged reason for firing the plaintiff was that she had struck a co-worker, the "relevant inquiry is not *what* happened [— *i.e.*, whether the employee actually struck her coworker —] but rather, what the *decisionmakers believed* happened").

The evidence before the Court indicates that Plaintiff was absent because of her disability, and that she was terminated primarily because of her absences, and not because of her disciplinary record.  The January 7, 2013 MOC recommended Plaintiff's termination solely because her use of sick leave "demonstrated her incompetence to perform the functions of Corrections Officer[s]."  (Defs. 56.1 ¶¶ 78, 80; Pl. 56.1 ¶¶ 78, 80; January 7, 2013 MOC.) Further, although after Plaintiff's OATH trial, the ALJ found that the DOC had proved all three disciplinary charges before her, she recommended termination for "medical incompetence." (Defs. 56.1 ¶¶ 94, 96; Pl. 56.1 ¶¶ 94, 96; Report and Recommendation 11.)  Where an employee is absent as a result of a disability and the employer is aware of that fact, there exists sufficient evidence to raise a triable issue of fact as to whether the defendants' proffered reason for termination is pretextual.  *See McMillan*, 711 F.3d at 129 (When "the employer complains of a conduct that is the direct result of the employee's disability . . . there is no need to evaluate whether the employer's adverse employment action made in response to that conduct is pretextual."); *Morris*, 153 F. Supp. 2d at 502 (employee's attendance record an impermissible pretext where the defendant was aware that absences were due to disability).

Plaintiff has satisfied her burden of demonstrating pretext, and the Court therefore denies Defendants' motion for summary judgment as to Plaintiff's ADA claim.

### d. Title VII discrimination

Defendants argue that Plaintiff cannot establish a prima facie case of gender, race, or ethnicity discrimination under Title VII because Plaintiff cannot show circumstances giving rise to an inference of discrimination.[5] (Defs. Mem. 8–11.) In addition, Defendants argue that even if Plaintiff can show an inference of discrimination in order to establish her prima facie case, the Court should nevertheless grant Defendants' motion because based on Plaintiff's excessive absenteeism and command disciplines, they have established a legitimate, nondiscriminatory reason for Plaintiff's termination, and Plaintiff cannot show that those reasons are pretext for gender, race, or ethnicity discrimination. (*Id.* at 13–17.)

Plaintiff argues that she can establish an inference of gender, race, and ethnicity discrimination and pretext because she has proffered evidence of several similarly situated non-Hispanic males who took lengthy medical leaves, but, unlike Plaintiff, were not terminated. (Pl. Opp'n 11–12, 28–30.)

Title VII prohibits an employer from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Claims of disparate treatment under Title VII are assessed using the burden-shifting framework established by the Supreme Court in *McDonnell Douglas*, 411 U.S. at 792. *See Kovaco v. Rockbestos–*

---

[5] Defendants argue that Plaintiff cannot show an inference of discrimination because she "claims to have heard about possible derogatory comments about Hispanics between inmates and officers, but does not know who the declarant was (the officers or the inmates) or what was said." (Defs. Mem. 8.) In addition, Defendants argue that Plaintiff's Title VII claim fails because "there is no evidence that any individual with ultimate decision-making authority . . . ever made a discriminatory remark or knew about any such remarks." (*Id.*) Because Plaintiff does not rely on any such remarks, the Court does not consider these arguments.

*Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016); *Littlejohn*, 795 F.3d at 307–08; *see also Tillery*, 739 F. App'x at 25. Under that framework, a plaintiff must first establish a prima facie case of discrimination. *Vega*, 801 F.3d at 83; *see also St. Mary's Honor Ctr.*, 509 U.S. at 506; *Tillery*, 739 F. App'x at 25; *Ruiz*, 609 F.3d at 491. If a plaintiff meets this "minimal" burden, *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 506), a "temporary presumption" of discrimination arises, and the burden shifts to the defendant-employer to articulate a legitimate, nondiscriminatory reason for the challenged conduct, *Vega*, 801 F.3d at 84 (quoting *Littlejohn*, 795 F.3d at 307, 311). The defendant's burden "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves*, 530 U.S. at 142 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 509). "If the employer is able to satisfy that burden, the inquiry then returns to the plaintiff, to demonstrate that the proffered reason is a pretext for discrimination." *United States v. City of New York*, 717 F.3d 72, 102 (2d Cir. 2013). To defeat summary judgment at this stage, "a plaintiff need only show that the defendant was in fact motivated at least in part by the prohibited discriminatory animus." *Henry*, 616 F.3d at 156; *see also Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013) ("An employee who alleges status-based discrimination under Title VII . . . [must] show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision.").

### i. Title VII prima facie case

To establish a prima facie case of employment discrimination under Title VII, a plaintiff must show that: "(1) she was within [a] protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Walsh*, 828 F.3d at 74; *see also*

*Meyer v. N.Y. State Office of Mental Health*, 679 F. App'x 89, 90 (2d Cir. 2017); *Littlejohn*, 795 F.3d at 307.

Defendants do not dispute that Plaintiff is a member of a protected class as a Hispanic woman, that she was qualified for the position that she held, or that her termination was an adverse employment action.

Inference of discrimination "is a 'flexible [standard] that can be satisfied differently in differing factual scenarios.'" *Saji*, 724 F. App'x at 17 (quoting *Chertkova v*, 92 F.3d at 91). "An inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" *Littlejohn*, 795 F.3d at 312 (quoting *Leibowitz*, 584 F.3d at 502).

"A showing of disparate treatment — that is, a showing that an employer treated plaintiff less favorably than a similarly situated employee outside his protected group — is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case." *Ruiz*, 609 F.3d at 493 (quoting *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)). To show an inference of discrimination through the more favorable treatment of employees not in the protected group, there must be "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases," such that "the comparator must be similarly situated to the plaintiff in all material respects." *Abdul–Hakeem v. Parkinson*, 523 F. App'x 19, 21 (2d Cir. 2013) (quoting *Ruiz*, 609 F.3d at 493); *see also Carris v. First Student, Inc.*, 682 F. App'x 30, 32 (2d Cir. 2017) ("To support a minimal inference of discrimination, a plaintiff may allege disparate treatment by showing the more favorable treatment of employees

not in the protected group, who are similarly situated in all material respects." (alterations, citations, and internal quotation marks omitted)); *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (explaining that to be "similarly situated," the plaintiff must establish that "she was similarly situated in all material respects to the individuals with whom she seeks to compare herself" (quoting *Graham*, 230 F.3d at 40)).

What facts establish similarity in "all material respects" varies from case to case, but the inquiry generally rests on whether the plaintiff and the putative comparator "were subject to the same workplace standards." *Brown*, 756 F.3d at 230; *see also Ruiz*, 609 F.3d at 493–94 ("An employee is similarly situated to co-employees if they were (1) 'subject to the same performance evaluation and discipline standards' and (2) 'engaged in comparable conduct.'" (quoting *Graham*, 230 F.3d at 40)). A plaintiff need not show that she and the putative comparator are identical, but rather that there is a "reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases." *Ruiz*, 609 F.3d at 494 (quoting *Graham*, 230 F.3d at 40); *see also Brown*, 756 F.3d at 230 ("The plaintiff's and comparator's circumstances must bear a 'reasonably close resemblance,' but need not be 'identical.'" (quoting *Graham*, 230 F.3d at 40)). "Whether two employees are similarly situated ordinarily presents a question of fact for the jury." *Graham*, 230 F.3d at 39; *see also Brown*, 756 F.3d at 230 (quoting same); *Harlen Assocs. v. Inc. Village of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001) ("As a general rule," whether employees are similarly situated "is a factual issue that should be submitted to the jury" unless "it is clear that no reasonable jury could find the similarly situated prong met.").

Plaintiff has provided sufficient evidence that she was similarly situated to the comparators that she identifies and that they were treated more favorably. Plaintiff identifies several non-Hispanic males who, like Plaintiff, worked in the Support Services Division, were

subjected to the same disciplinary standards as Plaintiff, and were absent from work for similar periods of time. (Pl. 56.1 ¶¶ 100, 232–34.) The length of the absence of several of the comparators, *e.g.*, Ronald Bitting's absence for 240 days in 2011 and 2012, Williams Reph's absence for 201 days between 2011 and 2012, and Louis Cretella's absence for 168 days in 2010 and 2011, are sufficiently comparable to Plaintiff's absence for approximately 160 work days from the time that she reported to HMD after her injury to the date that Defendants initiated her termination, and the time that Plaintiff reported her injury to the date that she returned to work, 202 work days.

Defendants' argument that Plaintiff's comparators are not sufficiently similar because they did not appear before OATH, (Defs. Mem. 9–10), undermines rather than supports Defendants' arguments. That is exactly Plaintiff's point. She was treated less favorably because, although her absences were similar in length to those of her non-Hispanic male comparators, the DOC took action against Plaintiff by initiating termination proceedings requiring her to appear before OATH, but the DOC did not initiate termination proceedings against any of Plaintiff's comparators. Thus, unlike Plaintiff, none of the otherwise similarly situated co-workers had to appear before OATH for the adjudication of his or her termination. Therefore, the DOC's failure to initiate termination proceedings against Plaintiff's comparators with similar absences, supports Plaintiff's claims that she was treated differently, and a reasonable jury could conclude that this disparate treatment was due in part to discriminatory reasons. Plaintiff has satisfied her burden of showing that she was "subject to the same disciplinary standards and . . . engaged in conduct of comparable seriousness," as her comparators, but, unlike her counterparts, was subject to an adverse employment action because of her conduct. *Graham*, 230 F.3d at 42; *see also id.* at 43–44 (explaining that the fact that non-

white employee was subjected to disciplinary action in accordance with employer policy and white employee was not raises an inference of discrimination and pretext); *Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 54 (2d Cir. 2014) ("[T]he fact that one comparator (who had been treated differently from the plaintiff) had committed fewer infractions than had the plaintiff d[oes] not in itself mean that he could not be a comparator.").

### ii.   Defendants' nondiscriminatory reasons

As discussed above in the context of Plaintiff's ADA claim, Defendants have satisfied their burden of showing a nondiscriminatory reason for Plaintiff's termination — the two command disciplines that Plaintiff received before she was injured, and her excessive absenteeism after her injury.  Defendants' motion for summary judgment as to Plaintiff's Title VII claims will therefore be granted unless Plaintiff has presented sufficient evidence for the Court to conclude that Defendants' proffered explanation for her termination is a pretext for gender, race, or ethnicity discrimination.

### iii.   Plaintiff has shown pretext

Defendants argue that Plaintiff cannot show that the DOC's reasons for terminating Plaintiff's employment are pretextual "for the same reasons that Plaintiff . . . is unable to establish an inference of discriminatory intent."  (Defs. Mem. 17.)

Plaintiff argues that her comparators provide sufficient evidence to demonstrate that Defendants' proffered reason for her termination are pretextual.  (Pl. Opp'n 27–30.)

As described above, a plaintiff may show pretext "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, [nondiscriminatory] reasons for its action."  *Graziadio*, 817 F.3d at 430 (quoting *Kwan*, 737 F.3d at 846).  At this stage, the court must "examine the entire record to determine whether the

plaintiff could satisfy [her] ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." *Walsh*, 828 F.3d at 76.

Plaintiff's comparators sufficiently show pretext. At the time that the DOC issued the MOC against Plaintiff, she had been absent on medical leave for approximately 160 work days. Two of Plaintiff's comparators, Cretella and Reph, both non-Hispanic men, were absent on medical leave for 168 days and 201 days respectively. (Pl. 56.1 ¶ 232.) In addition, several non-Hispanic male comparators were absent for significant periods of time, approximately twenty to fifty days less than Plaintiff. For example, Savarese was absent for 137 days between 2013 and 2014, Wayson was absent for 138 days in 2012, and Stalanski was absent for 116 days between 2012 and 2013. (*Id.*) None of these non-Hispanic males were disciplined — much less terminated — for their absenteeism. (*Id.* ¶ 234.)

Defendants' argument that the comparators are inadequate because they had a "materially dissimilar disciplinary record," (Defs. Mem. 9), is unpersuasive. Although Plaintiff was the subject of two MOC's before the January 7, 2013 MOC that recommended her termination, and Cretella, Savarese, Stalanski, and Wayson were never subject to an MOC before (or as a result of) their prolonged medical absences, (Pl. 56.1 ¶ 107), a rational juror could find that Defendants did not terminate Plaintiff because of her disciplinary record, as the record shows that Defendants terminated Plaintiff because of her use of sick leave from May 29, 2012 to January 7, 2013, which, according to Defendants, "demonstrated her incompetence to perform the functions of a Corrections Officer." (Defs. 56.1 ¶¶ 78, 80; Pl. 56.1 ¶¶ 78, 80; January 7, 2013 MOC.) Further, the ALJ report recommended that Plaintiff be terminated for "medical incompetence" and explained that "the offense" was Plaintiff's "continued absence." (Report and Recommendation 3.) Defendant's attempt to use Plaintiff's two disciplinary charges from

over two years prior to her termination to justify their differing treatment of Plaintiff, compared to their treatment of several comparators, is pretextual. *See, e.g.*, *Graham*, 230 F.3d at 43 ("A showing that similarly situated employees belonging to a different . . . group received more favorable treatment can . . . serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the adverse job action was a pretext."); *Peralta v. Roros 940, Inc.*, 72 F. Supp. 3d 385, 393 (E.D.N.Y. Dec. 10, 2014) (finding pretext where the proffered reason for termination "applied with equal force" to a number of employees outside of the plaintiff's protected class who "nonetheless kept their jobs"); *id.* ("Employees can be 'similarly situated' even if their misconduct is not 'identical' in all respects. There just needs to be a 'reasonably close resemblance of the facts and circumstances.'" (quoting *Graham*, 230 F.3d at 40)); *Temple v. City of New York*, No. 06-CV-2162, 2010 WL 3824116, at *10 (E.D.N.Y. Sept. 23, 2010) (finding pretext where evidence showed that employer "routinely overlooked misconduct committed by Caucasian employees, but would not hesitate to formally charge [the plaintiff] with disciplinary infractions"); *cf. Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 464 (S.D.N.Y. 2006) ("When a plaintiff's misconduct is objectively more serious than that of a proposed comparator, differential treatment by the employer does not create an issue of fact that will defeat summary judgment.").

Accordingly, the Court denies Defendants' motion for summary judgment as to Plaintiff's discrimination claim under Title VII.

### e.    Plaintiff's FMLA retaliation claim

Defendants argue that Plaintiff's FMLA retaliation claim must be dismissed because "the DOC's sick leave policy is more favorable than what the FMLA requires, since it is unlimited in time, and provides leave with pay." (Defs. Mem. 13.) In addition, Defendants argue that

Plaintiff cannot establish a prima facie case of retaliation under the FMLA because she did not provide reasonable notice that she requested time off for a serious health condition, (*id.* at 12), and "offers no evidence to support her claim that she took FMLA-protected leave," (Defs. Reply Mem. in Further Supp. of Defs. Mot. ("Defs. Reply") 10, Docket Entry No. 41).

Plaintiff claims that Defendants "violated the FMLA by terminating [her] for being out on medical leave, a large part of which was protected under the FMLA." (Pl. Opp'n 30.) She also argues that because "the [forty] day rule [instructing that an employee who is on sick leave for more than forty days within a year may be subject to termination] does not exclude FMLA leave in counting to [forty] days," Defendants considered Plaintiff's "taking of leave protected by the FMLA" in deciding to terminate her, in violation of the statute. (*Id.* at 32.)

"The FMLA gives eligible employees an 'entitlement' to twelve weeks per year of unpaid leave '[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Sista*, 445 F.3d at 174 (quoting 29 U.S.C. § 2612(a)(1)(D)). It "'creates a private right of action to seek both equitable relief and money damages against any employer . . . ' should that employer 'interfere with, restrain, or deny the exercise of' FMLA rights." *Id.* (quoting *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 724–25 (2003)). "The Second Circuit recognizes distinct claims of interference and retaliation under the FMLA." *Id.* at 175; *see also Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 166 (2d Cir. 2017) ("FMLA claims come in at least two varieties: interference and retaliation." (citing *Potenza v. City of New York*, 365 F.3d 165, 167 (2d Cir. 2004))). Retaliation claims "involve an employee actually exercising her rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by the employer." *Woods*, 864 F.3d at 166.

"At the summary judgment stage, retaliation claims brought pursuant to the FMLA are analyzed under the burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Alexander v. The Bd. of Educ. of City of N.Y.*, 648 F. App'x 118, 121 (2d Cir. 2016). Under that framework, a plaintiff must first establish a prima facie case of discrimination. *Graziadio*, 817 F.3d at 429. A plaintiff's burden at this stage is "minimal." *Holcomb*, 521 F.3d at 139 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 506). If a plaintiff meets her burden at this stage, the burden shifts to the defendant-employer to "demonstrate a legitimate, non-discriminatory reason for its actions." *Graziadio*, 817 F.3d at 429; *see also Vega*, 801 F.3d at 84. If the defendant-employer articulates such a reason, the burden shifts back to the plaintiff-employee to show that the defendant-employer's reason was pretext. *Graziadio*, 817 F.3d at 429; *see also Sista*, 445 F.3d at 169 ("A plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext.").

### i.  FMLA prima facie case

In order to make out a prima facie case of FMLA retaliation, a plaintiff must establish that "(1) [s]he exercised rights protected under the FMLA; (2) [s]he was qualified for h[er] position; (3) [s]he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza*, 365 F.3d at 168; *see also Turner v. Eastconn Reg'l Educ. Serv. Ctr.*, 588 F. App'x 41, 44 (2d Cir. 2014) (citing same); *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 151 (2d Cir. 2012) (citing same). The plaintiff "must demonstrate that [her] taking FMLA leave constituted 'a negative factor in [the defendant's] decision to terminate' . . . her." *Wanamaker v. Westport*

*Bd. of Educ.*, 899 F. Supp. 2d 193, 207 (D. Conn. 2012) (citing *Sista*, 445 F.3d at 176); *see also Hale v. Mann*, 219 F.3d 61, 68 (2d Cir. 2000) (holding that the FMLA "protects an employee from discharge or demotion by an employer if that action is motivated by the employee's taking leave pursuant to the FMLA").

Defendants dispute only one element of Plaintiff's prima facie case under the FMLA, whether she exercised rights protected under the statute.

In order to exercise rights protected under the FMLA, an employee must request FMLA leave due to a qualifying illness or condition. *See Wahl v. Cty. of Suffolk*, 466 F. App'x 17, 20 (2d Cir. 2012); *Dighello v. Thurston Foods, Inc.*, 307 F. Supp. 3d 5, 14 (D. Conn. 2018); *Hahn v. Office & Prof'l Emps. Intern'l Union, Local 153*, No. 13-CV-946, 2016 WL 4120517, at *5 (S.D.N.Y. July 22, 2016); *Nally v. New York*, No. 10-CV-1186, 2013 WL 2384252, at *16 (N.D.N.Y. May 30, 2013). A plaintiff does not exercise her rights under the statute when she is informed that she can take leave under the FMLA but chooses not to do so. *Wahl*, 466 F. App'x at 20.

Plaintiff has not shown that she exercised rights protected by the FMLA. DOC policy indicates that eligible employees may *either* take up to twelve weeks of unpaid leave under the FMLA *or* take medical leave that allows employees to remain absent and receive their full salary, though they must remain confined to their homes for all but four hours a day and periodically report to HMD. (Pl. 56.1 ¶ 142; Defs. Reply 56.1 ¶ 142; DOC Employee Rules and Regs. 711.) Plaintiff testified at her deposition that during her approximately forty-week leave from May 29, 2012 to March 7, 2013, she stayed inside twenty hours a day, seven days a week "in accordance with the DOC rules." (Vives Dep. 69:23–70:6.) In addition, Plaintiff testified that she was paid during her absence. (*Id.* at 111:9–19.) Because (1) Plaintiff's medical leave

extended well beyond the twelve-week period contemplated under the FMLA; (2) Plaintiff

adhered to DOC policy that employees remain confined to their homes for twenty hours a day

while on medical leave; and (3) Plaintiff was compensated during her medical leave, no

reasonable jury could conclude that Plaintiff exercised her rights pursuant to the FMLA rather

than the DOC's medical leave policy. Plaintiff has therefore failed to establish a prima facie

case of retaliation under the FMLA, and the Court grants Defendants' motion for summary

judgment as to her FMLA claim. *See Wahl*, 466 F. App'x at 20 (employee who chose to use sick

leave policy instead of FMLA leave did not exercise FMLA rights); *Hahn*, 2016 WL 4120517, at

*5 (holding that the plaintiff did not exercise protected rights because he "never invoked or even

attempted to use FMLA leave"); *McNamara v. Trinity Coll.*, No. 12-CV-363, 2013 WL 164221,

at *2 (D. Conn. Jan. 15, 2013) ("District courts in this Circuit have . . . reject[ed] FMLA

retaliation claims where the plaintiffs failed to follow their employer's procedures for requesting

FMLA leave.").

## III. Conclusion

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion

for summary judgment. The Court denies Defendants' motion as to Plaintiff's ADA and Title

VII discrimination claims, and grants Defendants' motion as to Plaintiff's FMLA claim.

Dated: March 27, 2019
   Brooklyn, New York

       SO ORDERED:


        _____s/ MKB_____
        MARGO K. BRODIE
        United States District Judge